**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **CERTAIN APPROVAL PROGRAMS, LLC,** | § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § | **Civil Action No. _____** |
| **BRYAN ELLIS, CAROLE JEANNE VANSICKLE, and, WEBWORDS, INC.,** | § § § § | |
| **Defendants.** | § § | |

---

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**

---

Plaintiff Certain Approval Programs, LLC ("Certain Approval") hereby files this Original Complaint and Jury Demand against Defendants Bryan Ellis ("Ellis"), Carole Jeanne VanSickle ("VanSickle"), and WebWords, Inc. ("WebWords") (collectively, "Defendants") on personal knowledge as to all facts regarding itself and on information and belief as to all other matters, as follows:

## I.

## PRELIMINARY STATEMENT

1.    Plaintiff Certain Approval seeks damages and injunctive relief from Defendants Ellis, VanSickle, WebWords, and their affiliates because they conned

it out of its customer email marketing lists that were worth hundreds-of-thousands of dollars in sales and commissions.  Certain Approval teaches people how to invest in depressed real estate, and earn a profit at it.  Unlike get-rich-quick television personalities, Plaintiff has made millions in the real estate business over the past forty years, and offers its experience and expertise to serious real estate investors at a premium.

2.     In order to market its services, Plaintiff developed and obtained customer email marketing lists of thousands of people who requested to learn more about sophisticated real estate investing strategies.  Plaintiff then agreed to joint venture with an Internet marketing team—Defendants—to help write copy, manage the interactions with potential clients, help build the customer email marketing lists, and market Plaintiff's and others' products to the lists.  Relying on their promises to dedicate their efforts in good faith and to keep Plaintiff's lists confidential and exclusive for the joint-venture, Plaintiff gave Defendants access to certain of its customer email marketing lists.  But instead of working for the benefit of the joint venture, Defendants simply absorbed Plaintiff's lists into their own separate email marketing lists, used Plaintiff's email marketing lists in several other joint ventures that excluded Plaintiff, and have earned hundreds-of-thousands

of dollars from Plaintiff's lists while refusing to acknowledge Plaintiff's rights and depriving Plaintiff of its fair share of the profits.

3.     Accordingly, Plaintiff seeks to enjoin Defendants from further misuse of its customer email marketing lists, to assert a constructive trust over their business in Plaintiff's favor, and to obtain damages and all other monetary relief it is entitled to for Defendants' breach of their fiduciary duties, misappropriation of Plaintiff's trade secrets in the form of its email marketing lists, and breaches of their joint venture contract, among other things.

## II.

## PARTIES

**A.     Plaintiff**

4.     Plaintiff Certain Approval Programs, LLC is a Louisiana limited liability company with its principal place of business in Jefferson, Louisiana. Certain Approval provides real estate investment consulting services for its clients.

**B.     Defendants**

5.     Defendant Bryan Ellis is an individual who, upon information and belief, is a citizen of the State of Georgia, and may be served at 3705 New Macland Road, Suite 200-134, Powder Springs, Georgia 30127.

6.     Defendant Carole Jeanne VanSickle is an individual who, upon information and belief, is a citizen of the State of Georgia, and may be served at 3705 New Macland Road, Suite 200-134, Powder Springs, Georgia 30127.

7.     Defendant WebWords, Inc. is a Georgia corporation that may be served via its registered agent, Carole Jeanne VanSickle, at 3705 New Macland Road, Suite 200-134, Powder Springs, Georgia 30127.

## III.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of jurisdiction of citizenship and the matter in controversy, exclusive of costs and interests, exceeds the sum or value of seventy-five-thousand dollars ($75,000.00).

9.     This Court has personal jurisdiction over each of the Defendants because (1) Defendants are each citizens of the State of Georgia, (2) Defendants committed one or more torts in whole or in part in Georgia, (3) Defendants have continuous and systematic business contacts with the State of Georgia, and (4) this lawsuit arises out of Defendants' specific contacts with the State of Georgia.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because each of the Defendants resides in the State of Georgia, a substantial part of

the events or omissions giving rise to Plaintiff's claims occurred in Georgia and this District, and Defendants have committed and continue to commit tortious acts in the State of Georgia and this District.

**IV.**

## **FACTUAL BACKGROUND**

**A.    Certain Approval And Its Established Real Estate Investment Consulting Business.**

11.    Certain Approval was created in 2005 to provide instructional programs for real estate investors.  Certain Approval's real estate investment consulting programs incorporate Certain Approval's officers' more than forty years of real estate investing experience and are sold as premium real estate investment consulting products.

12.    Like many other Internet-savvy businesses, Certain Approval markets its programs over the Internet and via email.  A list of the email addresses of active real estate investors is a valuable asset to a company like Certain Approval, which cannot only send emails to the list to market its programs, but also market the programs of others in exchange for a commission (called an "affiliate commission") and drive traffic to its website to generate additional revenue through pay-per-click advertising.

13.   In early 2010, Certain Approval purchased a company called EasyHud.com, primarily because it owned a real estate consulting website— EasyHud.com—and two robust email marketing lists of active real estate investors. At the time, the EasyHud.com website had accumulated over 10,000 email addresses on its email marketing list (the "EasyHud List"), and a second, separate list had over 13,000 email addresses of active real estate investors (the "Virtual Investors List").

14.   The EasyHud List and Virtual Investors List consisted of information that is not commonly known by or available to the public.

15.   The EasyHud List and the Virtual Investors List derive economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure and use.

16.   Reasonable efforts were made, under the circumstances, to maintain the secrecy of the EasyHud List and the Virtual Investors List by storing them in a secure, password-protected database.

**B.   Bryan Ellis: An Aspiring Email Marketer With A History Of Defrauding His Partners.**

17.   Bryan Ellis, together with his wife, Carole Jeanne VanSickle, and their company, WebWords, operate their own real estate consulting website known

as The Bryan Ellis Real Estate Letter, which is located on the Internet at www.realestate.bryanellis.com.

18.    Like many of the other real estate consulting websites, visitors can register their email addresses to join Defendants' email marketing list (the "BEREL List").

19.    In addition to operating The Bryan Ellis Real Estate Letter, Defendants managed the email marketing lists of several other real estate consultants and Internet marketers, including Dan Auito, Sal Buscemi, Scott Roemermann, Peter Vekselman, Ken Wade, and others.

20.    In this capacity, Defendants were responsible for creating email marketing content to generate revenue by promoting the real estate consulting products of their clients or affiliates.

21.    However, in managing these email marketing lists, Defendants copied email addresses from these lists onto Defendants' own, separate email marketing list—the BEREL List.

22.    Defendants also directed the recipients of these marketing emails to Defendants' separate website, which increased their own email marketing list and generated revenue from pay-per-click advertising which they did not share with their clients.

23.    Further, Defendants cheated their clients out of money due them from their marketing efforts.

24.    At the time Plaintiff entered into a joint venture agreement with Defendants (discussed below), Plaintiff was unaware of these unlawful practices by Defendants.

**C.    Bryan Ellis, Carole Jeanne VanSickle, And WebWords, Inc. Devise A Scheme To Steal Certain Approval's Email Marketing Lists.**

25.    Bryan Ellis, his wife, Carole Jeanne VanSickle, and their company, WebWords, Inc., recognized the tremendous value of Certain Approval's EasyHud and Virtual Investors Lists.  Not only did these lists represent approximately 23,000 email recipients, Certain Approval's lists were robust in that the email recipients were active real estate investors.

26.    To obtain Certain Approval's EasyHud and Virtual Investors Lists, Defendants devised a plan to trick Certain Approval into giving Defendants access to its number one asset—its email lists.

27.    In late 2009, Ellis reached out to Certain Approval to propose working together in some capacity.  Jack Sternberg ("Sternberg"), the president of Certain Approval, stopped by Atlanta, Georgia to meet with WebWords' Ellis and VanSickle on a return trip from Florida.  Sternberg had dinner with Ellis during

8

which the two engaged in general discussions about the possibility of working together.  At this time, the two did not discuss any specifics.

28.     The following day, Sternberg met with both Ellis and VanSickle over breakfast.  During this meeting, Ellis and VanSickle discussed with Sternberg the possibilities of working with Certain Approval.

29.     Between February 25 and 28, 2010, Defendants met with Certain Approval in New Orleans, Louisiana, to propose a joint venture.  While VanSickle was travelling to New Orleans for a trade show, Ellis tagged along to meet with Certain Approval.

30.     During the day, while VanSickle attended the trade show, Ellis met with Certain Approval's Sternberg to discuss the details of the proposed joint venture.  The joint venture included four parties—Certain Approval on one side and WebWords, Ellis in his individual capacity, and VanSickle in her individual capacity, on the other side.

31.     Ellis made multiple representations to Certain Approval's Sternberg during this meeting.  Specifically, Ellis affirmatively represented to Certain Approval that:

   a) WebWords, Ellis, and VanSickle intended to work with Certain Approval in the joint venture in good faith;

b) WebWords, Ellis, and VanSickle would timely pay Certain Approval all monies properly owed;

c) WebWords, Ellis, and VanSickle would share the profits of the Joint Venture with Plaintiff 50/50, with WebWords, Ellis, and VanSickle receiving 50% collectively and Certain Approval receiving 50%;

d) WebWords, Ellis, and VanSickle would reimburse Certain Approval 50% of all expenses Certain Approval incurred for the Joint Venture;

e) When the joint venture terminated, WebWords, Ellis, and VanSickle would treat Certain Approval properly and promptly pay all outstanding monies owed to Certain Approval;

f) Everything in the Joint Venture would be done correctly and accurately;

g) Everything that WebWords, Ellis, and VanSickle did in the real estate investment consulting space would be for the benefit of the Joint Venture;

h) WebWords, Ellis, and VanSickle would keep Certain Approval's email marketing lists confidential and use them exclusively for the Joint Venture;

i)  WebWords, Ellis, and VanSickle would not trade or sell any email marketing lists provided by Certain Approval;

j)  WebWords, Ellis, and VanSickle would be "completely transparent" and would provide Certain Approval with access to all bank, merchant, email, and affiliate marketing accounts used by the Joint Venture;

k)  Upon termination of the Joint Venture, WebWords, Ellis, and VanSickle would provide Certain Approval with a complete copy of all email marketing lists used by the Joint Venture;

l)  WebWords, Ellis, and VanSickle would not use Certain Approval's email marketing lists for their own benefit; and

m) WebWords, Ellis, and VanSickle would not use Certain Approval's email marketing lists after the termination of the Joint Venture if WebWords, Ellis, and VanSickle did not act in good faith in the Joint Venture.

32.    Ellis made these misrepresentations to Certain Approval knowing they were false.

33.    Ellis made these misrepresentations to Certain Approval with the intent that Certain Approval rely on them by entering into the Joint Venture Agreement and providing its trade secret email lists to Defendants.

34.    Ellis made these misrepresentations to Certain Approval so that Certain Approval would enter into the Joint Venture Agreement and provide its trade secret email marketing lists to Defendants.

35.    Ellis made these misrepresentations to Certain Approval in both his capacity as general manager of WebWords and in his individual capacity.

36.    Later that day, Certain Approval's Sternberg attended dinner with both Ellis and VanSickle.  This meeting was crucial to forming the joint venture because VanSickle was the owner of WebWords.

37.    During this dinner, VanSickle affirmatively represented to Certain Approval's Sternberg that:

    a) WebWords, Ellis, and VanSickle intended to work with Certain Approval in the joint venture in good faith and with the best intentions;

    b) VanSickle was behind the joint venture 100%;

    c) WebWords, Ellis, and VanSickle would timely pay Certain Approval all monies properly owed;

d) WebWords, Ellis, and VanSickle would share the profits of the Joint Venture with Plaintiff 50/50, with WebWords, Ellis, and VanSickle receiving 50% collectively and Certain Approval receiving 50%;

e) WebWords, Ellis, and VanSickle would reimburse Certain Approval 50% of all expenses Certain Approval incurred for the Joint Venture;

f) When the joint venture terminated, WebWords, Ellis, and VanSickle would treat Certain Approval properly and promptly pay all outstanding monies owed to Certain Approval;

g) VanSickle would make sure that things went smoothly and properly with Certain Approval because it was too good of an opportunity to lose;

h) Everything would be done correctly and accurately;

i) Everything that WebWords, Ellis, and VanSickle did in the real estate investment consulting space would be for the benefit of the Joint Venture;

j) WebWords, Ellis, and VanSickle would only use Certain Approval's email marketing lists for the benefit of the Joint Venture;

k) WebWords, Ellis, and VanSickle would not trade or sell any email marketing lists provided by Certain Approval;

l)  WebWords, Ellis, and VanSickle would be "completely transparent" and would provide Certain Approval with access to all bank, merchant, email, and affiliate marketing accounts used by the Joint Venture; and

m) Upon termination of the Joint Venture, WebWords, Ellis, and VanSickle would provide Certain Approval with a complete copy of all email marketing lists used by the Joint Venture.

38.   VanSickle made these misrepresentations to Certain Approval knowing they were false.

39.   VanSickle made these misrepresentations to Certain Approval with the intent that Certain Approval rely on them by entering into the Joint Venture Agreement and providing its trade secret email lists to Defendants.

40.   VanSickle made these misrepresentations to Certain Approval so that Certain Approval would enter into the Joint Venture Agreement and provide its trade secret email marketing lists to Defendants.

41.   VanSickle made these misrepresentations to Certain Approval in both her capacity as the owner of WebWords and in her individual capacity.

42.   After negotiation, Defendants WebWords, Ellis in his individual capacity, and VanSickle in her individual capacity, and Certain Approval agreed to

14

form an email marketing joint venture (the "Joint Venture") with the following twelve key terms (the "Joint Venture Agreement"):

43.   One, Defendants would provide their BEREL List, which had approximately 13,000 email addresses, to the Joint Venture.

44.   Two, Certain Approval would provide its EasyHud and Virtual Investors Lists to the Joint Venture.

45.   Three, Certain Approval would use its substantial contacts in the real estate consulting industry to enter into affiliate agreements with others to market to the BEREL, EasyHud, and Virtual Investors Lists.

46.   Four, Defendants would create the email content for the marketing emails.

47.   Five, Defendants would manage the day to day activities of the email marketing campaigns for each of the three lists.

48.   Six, Certain Approval and Defendants would split all profits generated in any way by the Joint Venture 50/50.

49.   Seven, Certain Approval and Defendants would split all expenses incurred in any way by the Joint Venture 50/50.

50.   Eight, Certain Approval would advance any money necessary for expenses, but would be reimbursed by the Joint Venture when money became

available.  Thus, Defendants agreed to reimburse Certain Approval for 50% of all expenses advanced.

51.  Nine, in time, Certain Approval would create a new real estate consulting product concerning investments in defaulted notes which would be marketed by the Joint Venture.

52.  Ten, both Certain Approval and Defendants would have complete access to all bank, merchant, email, and affiliate marketing accounts used by the Joint Venture.

53.  Eleven, Certain Approval would handle the bookkeeping for the Joint Venture.

54.  Twelve, upon conclusion of the Joint Venture, each side would be entitled to a full copy of the three email marketing lists (the BEREL, EasyHud, and Virtual Investors Lists).

55.  Importantly, the parties expressly premised their agreement to share rights to use each other's lists upon conclusion of the Joint Venture on each side working in good faith for the benefit of the Joint Venture.

56.  Certain Approval did not agree to enter into the Joint Venture until March 2010, when Ellis emphasized to Certain Approval in a Skype discussion:

> There must be a good faith effort at this before either of
> us pulls out with any right to the other person's lists –

16

> meaning that we both devote legitimate, significant and exclusive effort to this partnership. For example: everything we both do in the REI market is subject to our agreement, the only exclusions being the few remaining JV's I already have scheduled and the coaching clients you already have with Tim.

57. This communication was made by Ellis to Certain Approval's Sternberg on or about March 8, 2010. Certain Approval's Sternberg was in Louisiana when he received this communication. A true and correct copy of the Skype Internet relay chat between Bryan Ellis of WebWords and Jack Sternberg of Certain Approval which details this agreement is attached hereto as Exhibit A.

58. Ellis made these misrepresentations to Certain Approval knowing they were false.

59. Ellis made these misrepresentations to Certain Approval with the intent that Certain Approval rely on them by entering into the Joint Venture Agreement and providing its trade secret email lists to Defendants.

60. Ellis made these misrepresentations to Certain Approval so that Certain Approval would enter into the Joint Venture Agreement and provide its trade secret email marketing lists to Defendants.

61. Ellis made these misrepresentations to Certain Approval in both his capacity as manager of WebWords and in his individual capacity.

62.   Certain Approval would not have entered into the Joint Venture Agreement and disclosed its confidential trade secret email lists to Defendants but for each of the Defendants' misrepresentations, noted above.

63.   Little did Certain Approval know that Ellis, VanSickle, and WebWords planned to defraud Certain Approval and steal its lists.

**D.   Defendants Convince Certain Approval To Obtain And Contribute An Additional 140,000 Email Addresses.**

64.   Upon forming the Joint Venture, Certain Approval and the Defendants communicated on an almost daily basis to get their Joint Venture off the ground. Ellis made a second trip to New Orleans to meet with Certain Approval within 30 or 45 days after the March 8, 2010 Skype conversation.  Certain Approval's Sternberg met with Ellis in his hotel room in New Orleans.  Sternberg and Ellis worked together in the hotel room on the Joint Venture, including devising specific email promotions, determining which other real estate products they wanted to promote through the Joint Venture and when they wanted to do said promotions, and reviewing the specific email address lists to be used in the Joint Venture.

65.   While gaining access to Certain Approval's EasyHud and Virtual Investors Lists with over 23,000 email addresses is good, more is better. Accordingly, Defendants convinced Certain Approval to use its hard-earned reputation and connections in the real estate investment consulting industry to

obtain an additional approximately 140,000 email addresses of real estate investors and provide them to the Joint Venture.

66.    First, Certain Approval obtained and provided to the Joint Venture an additional list of 20,000 email addresses of real estate investors ("Additional List 1").

67.    Second, Certain Approval obtained and provided to the Joint Venture an additional list of 30,000 email addresses of real estate investors ("Additional List 2").

68.    Third, Certain Approval obtained and provided to the Joint Venture an additional list of 40,000 email addresses of real estate investors ("Additional List 3").

69.    Fourth, Certain Approval obtained and provided to the Joint Venture an additional list of 50,000 email addresses of real estate investors ("Additional List 4") (Additional List 1, Additional List 2, Additional List 3, and Additional List 4, collectively, the "Additional Lists").

70.    As Defendants controlled the email marketing campaigns for the Joint Venture, the Additional Lists were sent directly to Defendants instead of Certain Approval, even though they belonged to Certain Approval.

71.    Certain Approval only directed that the Additional Lists be sent directly to Defendants because Defendants entered into a confidential relationship with Plaintiff and because Defendants represented that they would not use Certain Approval's email lists for their own, separate benefit.

72.    The Additional Lists consisted of information that is not commonly known by or available to the public.

73.    The Additional Lists derive economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure and use.

74.    Reasonable efforts were made, under the circumstances, to maintain the secrecy of the Additional Lists by storing them in a secure, password-protected database.

75.    With the addition of these approximately 140,000 email addresses from the Additional Lists (collectively, the Additional Lists with the EasyHud and Virtual Investors Lists, the "Certain Approval Lists"), Certain Approval provided a total of approximately 163,000 email addresses to the Joint Venture, while Defendants only provided approximately 13,000.

20

**E.      The Disloyal Fiduciaries: Defendants Lock Certain Approval Out Of Its Share Of Profits And Steal The Certain Approval Lists.**

76.      While the Joint Venture began its activities in March 2010, it did not take long for Defendants to show their true colors.

77.      Defendants structured emails sent to the various lists so that Defendants—not the Joint Venture—would be credited with affiliate sales in Defendants' separate affiliate marketing accounts.

78.      Defendants did not provide Certain Approval with access to these affiliate marketing accounts.

79.      Thus, Certain Approval had no way of knowing exactly how much money was generated by the Joint Venture.

80.      Defendants also directed the recipients of these marketing emails to Defendants' separate website from which Defendants generated money from pay-per-click advertising.

81.      Defendants did not share any of this pay-per-click advertising money with Certain Approval.

82.      Defendants also directed all revenue for the Joint Venture through their separate bank and merchant accounts, as opposed to accounts for the Joint Venture.

21

83.    Defendants refused to provide Certain Approval with complete access to these accounts.

84.    Accordingly, Certain Approval was unable to conduct the bookkeeping for the Joint Venture.

85.    Defendants refused to pay Certain Approval with its 50% share of all profits of the Joint Venture.

86.    Defendants also entered into separate affiliate and joint venture agreements with third parties during this time in which it used the Certain Approval Lists, but did not provide Certain Approval its share of the profits.

87.    These competing activities included, but are not limited to, deals with Jack Bosch's real estate investing program, Bob Diamond's "Attorney X" program, Ron Hillman's Foreclosure Treasure Hunt program, and Mike Payne's credit repair program.

88.    Defendants also copied the Certain Approval Lists for their own use, separate from the Joint Venture.

**F.    Just Five Months After Forming The Joint Venture, Certain Approval Realizes Defendants' Fraud And Terminates The Joint Venture.**

89.    By July 2010, just five months after the parties launched the Joint Venture, it became clear that Defendants never intended to honor the Joint Venture Agreement.

22

90.     When Certain Approval realized that only Defendants were benefitting in the Joint Venture, Certain Approval demanded a full accounting and its fair share of the profits from the Joint Venture.

91.     Defendants refused.

92.     In light of Defendants' breaches of the Joint Venture Agreement, Certain Approval terminated the Joint Venture.

93.     Defendants agreed to this termination.

94.     While the termination of the Joint Venture triggered certain obligations and responsibilities—such as paying Certain Approval its full share of all profits from the Joint Venture and the return of all of its assets, namely, the Certain Approval Lists—nevertheless, Defendants continued to operate in breach of the Joint Venture Agreement.

95.     Despite the fact that Defendants did not operate in good faith in the Joint Venture, which was an express condition of the Joint Venture Agreement, Defendants continued to use the Certain Approval Lists for their own use and benefit.

96.     Defendants used the Certain Approval Lists in a joint venture or other arrangement with Tim Berry.

97.    Defendants have not provided Certain Approval with any of the profits generated from this business arrangement with Tim Berry.

98.    Defendants used the Certain Approval Lists in a joint venture or other arrangement with Josh Cantwell.

99.    Defendants have not provided Certain Approval with any of the profits generated from this business arrangement with Josh Cantwell.

100.   Defendants used the Certain Approval Lists in a joint venture or other arrangement with J.J. Childress.

101.   Defendants have not provided Certain Approval with any of the profits generated from this business arrangement with J.J. Childress.

102.   Defendants used the Certain Approval Lists in a joint venture or other arrangement with Zack Childress.

103.   Defendants have not provided Certain Approval with any of the profits generated from this business arrangement with Zack Childress.

104.   Defendants used the Certain Approval Lists in a joint venture or other arrangement with the Commercial Investment Group.

105.   Defendants have not provided Certain Approval with any of the profits generated from this business arrangement with the Commercial Investment Group.

106.   Defendants used the Certain Approval Lists in a joint venture or other arrangement with Dean Eddleson.

107.   Defendants have not provided Certain Approval with any of the profits generated from this business arrangement with Dean Eddleson.

108.   Defendants used the Certain Approval Lists in a joint venture or other arrangement with Preston Ely.

109.   Defendants have not provided Certain Approval with any of the profits generated from this business arrangement with Preston Ely.

110.   Defendants used the Certain Approval Lists in a joint venture or other arrangement with Tom Garlock.

111.   Defendants have not provided Certain Approval with any of the profits generated from this business arrangement with Tom Garlock.

112.   Defendants used the Certain Approval Lists in a joint venture or other arrangement with Richard Geller.

113.   Defendants have not provided Certain Approval with any of the profits generated from this business arrangement with Richard Geller.

114.   Defendants used the Certain Approval Lists in a joint venture or other arrangement with Justin Lee.

115.   Defendants have not provided Certain Approval with any of the profits generated from this business arrangement with Justin Lee.

116.   Defendants used the Certain Approval Lists in a joint venture or other arrangement with Bob Massey.

117.   Defendants have not provided Certain Approval with any of the profits generated from this business arrangement with Bob Massey.

118.   Defendants used the Certain Approval Lists in a joint venture or other arrangement with Ben Pargman.

119.   Defendants have not provided Certain Approval with any of the profits generated from this business arrangement with Ben Pargman.

120.   Defendants used the Certain Approval Lists in a joint venture or other arrangement with Patrick Riddle.

121.   Defendants have not provided Certain Approval with any of the profits generated from this business arrangement with Patrick Riddle.

122.   Defendants used the Certain Approval Lists in a joint venture or other arrangement with Kenny Rushing.

123.   Defendants have not provided Certain Approval with any of the profits generated from this business arrangement with Kenny Rushing.

124.   Defendants used the Certain Approval Lists in a joint venture or other arrangement with Russ Whitney.

125.   Defendants have not provided Certain Approval with any of the profits generated from this business arrangement with Russ Whitney.

126.   Upon information and belief, Defendants traded or sold copies of the Certain Approval Lists, or portions thereof, with third parties.

127.   Defendants have not provided Certain Approval with copies of these traded-for lists or any of the profits therefrom.

128.   Defendants also continued to withhold profits due Certain Approval for business generated during the period the Joint Venture.

129.   Defendants have not paid Certain Approval any money for the profits they generated after the Joint Venture by using the Certain Approval Lists.

130.   And Defendants kept Certain Approval in the dark by refusing to provide Certain Approval with complete access to the bank, merchant, email, and affiliate marketing accounts used by the Joint Venture.

131.   Further, Defendants refused to provide Certain Approval with complete copies of the Additional Lists.

**G.     The Aftermath.**

132.   For all practical purposes, Defendants have stolen Certain Approval's business.

133.   On July 30, 2010, Certain Approval, through its legal counsel, made a written demand for its complete share of the profits from the Joint Venture.

134.   Defendants refused this demand.

135.   Nevertheless, Defendants continue to use the Certain Approval Lists for their own benefit, amassing hundreds-of-thousands, if not millions, of dollars in profits, while Defendants have not even done so much as to provide Certain Approval with complete copies of the Additional Lists.

## V.

## CLAIMS

### Count One: Misappropriation Of Trade Secrets

136.   Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as if set forth in full herein.

137.   Plaintiff possessed trade secrets in the form of the EasyHud List.

138.   Plaintiff possessed trade secrets in the form of the Virtual Investors List.

139.   Plaintiff possessed trade secrets in the form of the Additional List 1.

140.   Plaintiff possessed trade secrets in the form of the Additional List 2.

141.   Plaintiff possessed trade secrets in the form of the Additional List 3.

142.   Plaintiff possessed trade secrets in the form of the Additional List 4.

143.   The Certain Approval Lists consisted of information, including a list of actual or potential customers, which is not commonly known by or available to the public.

144.   The Certain Approval Lists derive economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

145.   Reasonable efforts were made, under the circumstances, to maintain the secrecy of the Certain Approval Lists by storing them in a secure, password-protected database.

146.   Defendants acquired the trade secrets of Certain Approval by improper means such as theft, misrepresentation, breach or inducement of breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means.

147.   Defendants acquired the trade secrets of Certain Approval knowing or having reason to know that the trade secrets were acquired by improper means.

148.   Defendants disclosed or used Certain Approval's trade secrets without express or implied consent by a person who:

    a.   Used improper means such as theft, misrepresentation, breach or inducement of breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means, to acquire knowledge of the trade secrets, or

    b.   At the time of disclosure or use, knew or had reason to know that knowledge of the trade secrets was:

        i.   Derived from or through a person who had utilized improper means such as theft, misrepresentation, breach or inducement of breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means, to acquire the trade secrets;

        ii.   Acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use of the trade secrets; or

        iii.   Derived from or through a person who owed a duty to Certain Approval to maintain the secrecy of the trade secrets or limit the use of the trade secrets.

30

149. Defendants' unlawful acts to misappropriate Plaintiff's trade secrets caused Plaintiff damage in an amount to be determined by the trier of fact.

150. Defendants' unlawful acts to misappropriate Plaintiff's trade secrets unjustly enriched Defendants in an amount to be determined by the trier of fact, to which Plaintiff is entitled.

151. Plaintiff is entitled to a constructive trust over all monies Defendants made and continue to make from the use of Plaintiff's trade secrets.

152. Plaintiff is entitled to disgorgement of all monies Defendants made and continue to make from the use of Plaintiff's trade secrets.

153. In the event that neither damages nor unjust enrichment caused by Defendants' misappropriation of Plaintiff's trade secrets is readily ascertainable, Plaintiff is entitled to an award of damages measured in terms of a reasonable royalty.

154. In the event the Court determines that it would be unreasonable to prohibit Defendants from the future use of Plaintiff's trade secrets, Plaintiff is entitled to a reasonable royalty.

155. Defendants' unlawful conduct was wanton, willful, and malicious, warranting the imposition of exemplary damages in an amount to be determined by the trier of fact.

156.   As Defendants' unlawful conduct was wanton, willful, and malicious, Plaintiff is entitled to its reasonable attorney's fees.

157.   Defendants' unlawful conduct has caused and will continue to cause Plaintiff irreparable injuries for which there is no adequate legal remedy. Accordingly, Plaintiff is entitled to permanent injunctive relief.

## Count Two: Breach Of Fiduciary Duties

158.   Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as if set forth in full herein.

159.   Plaintiff and Defendants formed a Joint Venture in or around March 2010.

160.   As members of this Joint Venture, Defendants formed a fiduciary or confidential relationship with Plaintiff where Defendants were so situated to exercise a controlling influence over the will, conduct, and interest of Plaintiff, or where Defendants formed a relationship of mutual confidence with Plaintiff.

161.   As members of this Joint Venture, Defendants owed fiduciary duties to Plaintiff, including but not limited to the duty of loyalty, the duty of full disclosure, the duty to not usurp corporate opportunities, the duty to not compete against the Joint Venture, the duty to account for all profits of the Joint Venture,

the duty to not improperly transfer assets out of the Joint Venture, and the duty of the utmost good faith, fairness, and honesty in their dealings with Plaintiff.

162.   Defendants also owed Plaintiff the fiduciary duty to protect Plaintiff's confidential information and intellectual property because they had been provided to Defendants under circumstances of trust and repose.

163.   Defendants breached these fiduciary duties to Plaintiff by, among other things, (1) refusing to properly pay Plaintiff 50% of all profits generated by the Joint Venture, (2) refusing to reimburse Plaintiff for 50% of all expenses Plaintiff advanced for the Joint Venture, (3) refusing to fully disclose all material facts related to the Joint Venture, such as the financial information of the Joint Venture, (4) competing against the Joint Venture, (5) using Plaintiff's and the Joint Venture's assets for Defendants' own benefit, (6) usurping corporate opportunities of the Joint Venture for Defendants' own benefit, (7) refusing to act in the utmost good faith, fairness, and honesty in their dealings with Plaintiff and the Joint Venture, (8) refusing to provide Plaintiff with complete access to the banking, merchant, email and affiliate marketing accounts used by the Joint Venture, (9) failing to account for all profits of the Joint Venture, (10) improperly transferring assets out of the Joint Venture, and (11) stealing the Certain Approval Lists.

164.   Defendants' breaches of fiduciary duties directly and proximately caused injury to Plaintiff which resulted in damages in an amount to be determined by the trier of fact.

165.   Defendants' breaches of fiduciary duties unjustly enriched Defendants in an amount to be determined by the trier of fact, to which Plaintiff is entitled.

166.   Defendants' unlawful conduct was wanton, willful, and malicious warranting the imposition of exemplary damages in an amount to be determined by the trier of fact.

167.   Defendants' unlawful conduct has caused and will, if not enjoined by the Court, continue to cause Plaintiff irreparable injuries for which there is no adequate legal remedy.   Accordingly, Plaintiff is entitled to permanent injunctive relief.

168.   Plaintiff is entitled to a constructive trust over 50% of all monies earned, received, or made by the Joint Venture.

169.   Plaintiff is entitled to disgorgement of 50% of all monies earned, received, or made by the Joint Venture.

170.   Plaintiff is entitled to a constructive trust over of all monies earned, received, or made by Defendants using the Certain Approval Lists.

171.   Plaintiff is entitled to disgorgement of all monies earned, received, or made by Defendants using the Certain Approval Lists.

172.   Plaintiff is also entitled to a full and complete accounting of all monies earned, received, made, or spent by the Joint Venture.

173.   Plaintiff is further entitled to a full and complete accounting of all monies earned, received, or made by Defendants using the Certain Approval Lists.

### **Count Three: Breach Of Contract**

174.   Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as if set forth in full herein.

175.   Plaintiff had a valid and binding contract with Defendants—the Joint Venture Agreement—that was entered into in March 2010.   The Joint Venture Agreement consisted of Certain Approval on one side, and WebWords, Ellis, in his individual capacity, and VanSickle, in her individual capacity, on the other side.

176.   The Joint Venture Agreement required Defendants to, among other things, (1) pay Plaintiff 50% of all profits generated by the Joint Venture, (2) reimburse Plaintiff for 50% of all expenses advanced by Plaintiff, (3) provide Plaintiff with complete access to all bank, merchant, email, and affiliate marketing accounts used by the Joint Venture, (4) provide Plaintiff with complete copies of

all email marketing lists upon termination of the Joint Venture, and (5) direct all of their business activities towards the benefit and promotion of the Joint Venture.

177.   Plaintiff performed all conditions precedent to the contract, or was excused from performing all conditions precedent to the contract.

178.   Defendants breached the contract by, among other things, (1) refusing to pay Plaintiff 50% of all profits generated by the Joint Venture, (2) refusing to reimburse Plaintiff for 50% of all expenses advanced by Plaintiff, (3) refusing to provide Plaintiff with complete access to all bank, merchant, email, and affiliate marketing accounts used by the Joint Venture, (4) refusing to provide Plaintiff with complete copies of all email marketing lists upon termination of the Joint Venture, (5) refusing to direct all of their business activities towards the benefit and promotion of the Joint Venture, (6) competing against Plaintiff and the Joint Venture for Defendants' own benefit, and (7) stealing the EasyHud, Virtual Investors, and the Additional Lists for Defendants' own benefit.

179.   Defendants' breaches directly and proximately caused injury to Plaintiff which resulted in damages in an amount to be determined by the trier of fact.

180.   Defendants' breaches unjustly enriched Defendants in an amount to be determined by the trier of fact, to which Plaintiff is entitled.

181. Plaintiff is entitled to a constructive trust over 50% of all monies earned, received, or made by the Joint Venture.

182. Plaintiff is entitled to disgorgement of 50% of all monies earned, received, or made by the Joint Venture.

183. Plaintiff is entitled to a constructive trust over of all monies earned, received, or made by Defendants using the Certain Approval Lists.

184. Plaintiff is entitled to disgorgement of all monies earned, received, or made by Defendants using the Certain Approval Lists.

185. Plaintiff is also entitled to a full and complete accounting of all monies earned, received, made, or spent by the Joint Venture.

186. Plaintiff is further entitled to a full and complete accounting of all monies earned, received, or made by Defendants using the Certain Approval Lists.

## **Count Four: Fraud**

187. Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as if set forth in full herein.

188. Defendants made several fraudulent misrepresentations to Plaintiff.

189. When Ellis and VanSickle traveled to New Orleans in between February 25 and 28, 2010, Ellis falsely and affirmatively represented to Certain

Approval's Sternberg that WebWords, Ellis, and VanSickle intended to work with Certain Approval in the joint venture in good faith.

190.  When Ellis and VanSickle traveled to New Orleans in between February 25 and 28, 2010, Ellis falsely and affirmatively represented to Certain Approval's Sternberg that WebWords, Ellis, and VanSickle would timely pay Certain Approval all monies properly owed.

191.  When Ellis and VanSickle traveled to New Orleans in between February 25 and 28, 2010, Ellis falsely and affirmatively represented to Certain Approval's Sternberg that WebWords, Ellis, and VanSickle would share the profits of the Joint Venture with Plaintiff 50/50, with WebWords, Ellis, and VanSickle receiving 50% collectively and Certain Approval receiving 50%.

192.  When Ellis and VanSickle traveled to New Orleans in between February 25 and 28, 2010, Ellis falsely and affirmatively represented to Certain Approval's Sternberg that WebWords, Ellis, and VanSickle would reimburse Certain Approval 50% of all expenses Certain Approval incurred for the Joint Venture.

193.  When Ellis and VanSickle traveled to New Orleans in between February 25 and 28, 2010, Ellis falsely and affirmatively represented to Certain Approval's Sternberg that upon termination of the Joint Venture, WebWords, Ellis,

and VanSickle would treat Certain Approval properly and promptly pay all outstanding monies owed to Certain Approval.

194.   When Ellis and VanSickle traveled to New Orleans in between February 25 and 28, 2010, Ellis falsely and affirmatively represented to Certain Approval's Sternberg that everything in the Joint Venture would be done correctly and accurately.

195.   When Ellis and VanSickle traveled to New Orleans in between February 25 and 28, 2010, Ellis falsely and affirmatively represented to Certain Approval's Sternberg that everything WebWords, Ellis, and VanSickle did in the real estate investment consulting space would be for the benefit of the Joint Venture.

196.   When Ellis and VanSickle traveled to New Orleans in between February 25 and 28, 2010, Ellis falsely and affirmatively represented to Certain Approval's Sternberg that WebWords, Ellis, and VanSickle would keep Certain Approval's email marketing lists confidential and use them exclusively for the Joint Venture.

197.   When Ellis and VanSickle traveled to New Orleans in between February 25 and 28, 2010, Ellis falsely and affirmatively represented to Certain

Approval's Sternberg that WebWords, Ellis, and VanSickle would not trade or sell any email marketing lists provided by Certain Approval.

198.   When Ellis and VanSickle traveled to New Orleans in between February 25 and 28, 2010, Ellis falsely and affirmatively represented to Certain Approval's Sternberg that WebWords, Ellis, and VanSickle would be "completely transparent" and would provide Certain Approval with access to all bank, merchant, email, and affiliate marketing accounts used by the Joint Venture.

199.   When Ellis and VanSickle traveled to New Orleans in between February 25 and 28, 2010, Ellis falsely and affirmatively represented to Certain Approval's Sternberg that upon termination of the Joint Venture, WebWords, Ellis, and VanSickle would provide Certain Approval with a complete copy of all email marketing lists used by the Joint Venture.

200.   When Ellis and VanSickle traveled to New Orleans in between February 25 and 28, 2010, Ellis falsely and affirmatively represented to Certain Approval's Sternberg that WebWords, Ellis, and VanSickle would not use Certain Approval's email marketing lists for their own benefit.

201.   When Ellis and VanSickle traveled to New Orleans in between February 25 and 28, 2010, Ellis falsely and affirmatively represented to Certain Approval's Sternberg that WebWords, Ellis, and VanSickle would not use Certain

Approval's email marketing lists after the termination of the Joint Venture if WebWords, Ellis, and VanSickle did not act in good faith in the Joint Venture.

202.   Ellis made these misrepresentations to Certain Approval knowing they were false.

203.   Ellis made these misrepresentations to Certain Approval with the intent that Certain Approval rely on them by entering into the Joint Venture Agreement and providing its trade secret email lists to Defendants.

204.   Ellis made these misrepresentations to Certain Approval so that Certain Approval would enter into the Joint Venture Agreement and provide its trade secret email marketing lists to Defendants.

205.   Ellis made these misrepresentations to Certain Approval in both his capacity as general manager of WebWords and in his individual capacity.

206.   When Ellis and VanSickle traveled to New Orleans between February 25 and 28, 2010, over a dinner attended by VanSickle, Ellis, and Sternberg, VanSickle falsely and affirmatively represented to Certain Approval's Sternberg that WebWords, Ellis, and VanSickle intended to work with Certain Approval in the joint venture in good faith and with the best intentions.

207.   When Ellis and VanSickle traveled to New Orleans between February 25 and 28, 2010, over a dinner attended by VanSickle, Ellis, and Sternberg,

VanSickle falsely and affirmatively represented to Certain Approval's Sternberg that VanSickle was behind the joint venture 100%.

208.   When Ellis and VanSickle traveled to New Orleans between February 25 and 28, 2010, over a dinner attended by VanSickle, Ellis, and Sternberg, VanSickle falsely and affirmatively represented to Certain Approval's Sternberg that WebWords, Ellis, and VanSickle would timely pay Certain Approval all monies properly owed.

209.   When Ellis and VanSickle traveled to New Orleans between February 25 and 28, 2010, over a dinner attended by VanSickle, Ellis, and Sternberg, VanSickle falsely and affirmatively represented to Certain Approval's Sternberg that WebWords, Ellis, and VanSickle would share the profits of the Joint Venture with Plaintiff 50/50, with WebWords, Ellis, and VanSickle receiving 50% collectively and Certain Approval receiving 50%.

210.   When Ellis and VanSickle traveled to New Orleans between February 25 and 28, 2010, over a dinner attended by VanSickle, Ellis, and Sternberg, VanSickle falsely and affirmatively represented to Certain Approval's Sternberg that WebWords, Ellis, and VanSickle would reimburse Certain Approval 50% of all expenses Certain Approval incurred for the Joint Venture.

211.   When Ellis and VanSickle traveled to New Orleans between February 25 and 28, 2010, over a dinner attended by VanSickle, Ellis, and Sternberg, VanSickle falsely and affirmatively represented to Certain Approval's Sternberg that when the joint venture terminated, WebWords, Ellis, and VanSickle would treat Certain Approval properly and promptly pay all outstanding monies owed to Certain Approval.

212.   When Ellis and VanSickle traveled to New Orleans between February 25 and 28, 2010, over a dinner attended by VanSickle, Ellis, and Sternberg, VanSickle falsely and affirmatively represented to Certain Approval's Sternberg that VanSickle would make sure that things went smoothly and properly with Certain Approval because it was too good of an opportunity to lose.

213.   When Ellis and VanSickle traveled to New Orleans between February 25 and 28, 2010, over a dinner attended by VanSickle, Ellis, and Sternberg, VanSickle falsely and affirmatively represented to Certain Approval's Sternberg that everything in the Joint Venture would be done correctly and accurately.

214.   When Ellis and VanSickle traveled to New Orleans between February 25 and 28, 2010, over a dinner attended by VanSickle, Ellis, and Sternberg, VanSickle falsely and affirmatively represented to Certain Approval's Sternberg

that everything that WebWords, Ellis, and VanSickle did in the real estate investment consulting space would be for the benefit of the Joint Venture.

215.   When Ellis and VanSickle traveled to New Orleans between February 25 and 28, 2010, over a dinner attended by VanSickle, Ellis, and Sternberg, VanSickle falsely and affirmatively represented to Certain Approval's Sternberg that WebWords, Ellis, and VanSickle would only use Certain Approval's email marketing lists for the benefit of the Joint Venture.

216.   When Ellis and VanSickle traveled to New Orleans between February 25 and 28, 2010, over a dinner attended by VanSickle, Ellis, and Sternberg, VanSickle falsely and affirmatively represented to Certain Approval's Sternberg that WebWords, Ellis, and VanSickle would not trade or sell any email marketing lists provided by Certain Approval.

217.   When Ellis and VanSickle traveled to New Orleans between February 25 and 28, 2010, over a dinner attended by VanSickle, Ellis, and Sternberg, VanSickle falsely and affirmatively represented to Certain Approval's Sternberg that WebWords, Ellis, and VanSickle would be "completely transparent" and would provide Certain Approval with access to all bank, merchant, email, and affiliate marketing accounts used by the Joint Venture.

218.   When Ellis and VanSickle traveled to New Orleans between February 25 and 28, 2010, over a dinner attended by VanSickle, Ellis, and Sternberg, VanSickle falsely and affirmatively represented to Certain Approval's Sternberg that upon termination of the Joint Venture, WebWords, Ellis, and VanSickle would provide Certain Approval with a complete copy of all email marketing lists used by the Joint Venture.

219.   VanSickle made these misrepresentations to Certain Approval knowing they were false.

220.   VanSickle made these misrepresentations to Certain Approval with the intent that Certain Approval rely on them by entering into the Joint Venture Agreement and providing its trade secret email lists to Defendants.

221.   VanSickle made these misrepresentations to Certain Approval so that Certain Approval would enter into the Joint Venture Agreement and provide its trade secret email marketing lists to Defendants.

222.   VanSickle made these misrepresentations to Certain Approval in both her capacity as owner of WebWords and in her individual capacity.

223.   On or about March 8, 2010, Ellis engaged in an online Skype conversation with Certain Approval's Sternberg. Sternberg was in Louisiana when

he received these communications.   During this conversation, Ellis falsely and affirmatively represented to Sternberg:

> There must be a good faith effort at this before either of us pulls out with any right to the other person's lists – meaning that we both devote legitimate, significant and exclusive effort to this partnership.   For example: everything we both do in the REI market is subject to our agreement, the only exclusions being the few remaining JV's I already have scheduled and the coaching clients you already have with Tim.

224.   Ellis made these misrepresentations to Certain Approval knowing they were false.

225.   Ellis made these misrepresentations to Certain Approval with the intent that Certain Approval rely on them by entering into the Joint Venture Agreement and providing its trade secret email lists to Defendants.

226.   Ellis made these misrepresentations to Certain Approval so that Certain Approval would enter into the Joint Venture Agreement and provide its trade secret email marketing lists to Defendants.

227.   Ellis made these misrepresentations to Certain Approval in both his capacity as general manager of WebWords and in his individual capacity.

228.   Plaintiff reasonably relied on each of the misrepresentations because it had no reason, at the time, to disbelieve Defendants.

229.   But for each of Defendants' misrepresentations, Plaintiff would not have entered into the Joint Venture Agreement.

230.   But for each of Defendants' misrepresentations, Plaintiff would not have provided Defendants with access to the EasyHud or Virtual Investors Lists.

231.   But for each of Defendants' misrepresentations, Plaintiff would not have provided Defendants with access to the Additional Lists.

232.   But for each of Defendants' misrepresentations, Plaintiff would not have advanced money for expenses for the Joint Venture.

233.   Because of Defendants' misrepresentations, Plaintiff lost money, time, effort, and resources.

234.   Defendants' fraudulent acts caused Plaintiff damage in an amount to be determined by the trier of fact.

235.   Defendants' fraudulent acts unjustly enriched Defendants in an amount to be determined by the trier of fact, to which Plaintiff is entitled.

236.   Defendants' unlawful acts were wanton, willful, and malicious warranting the imposition of exemplary damages in an amount to be determined by the trier of fact.

237.   Plaintiff is entitled to a constructive trust over 50% of all monies earned, received, or made by the Joint Venture.

238.   Plaintiff is entitled to disgorgement of 50% of all monies earned, received, or made by the Joint Venture.

239.   Plaintiff is entitled to a constructive trust over of all monies earned, received, or made by Defendants using the Certain Approval Lists.

240.   Plaintiff is entitled to disgorgement of all monies earned, received, or made by Defendants using the Certain Approval Lists.

241.   Defendants' unlawful conduct has caused and will continue to cause Plaintiff irreparable injuries for which there is no adequate legal remedy. Accordingly, Plaintiff is entitled to permanent injunctive relief.

242.   Plaintiff is entitled to benefit-of-the-bargain damages from Defendants' fraudulent conduct in an amount determined by the trier of fact.

243.   Plaintiff is also entitled to rescission of the Joint Venture Agreement.

## Count Five: Conversion

244.   Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as if set forth in full herein.

245.   Certain Approval owned, possessed, or had the right to immediate possession of property, including but not limited to:

246.   The EasyHud List;

247.   The Virtual Investors List;

248.   The Additional List 1;

249.   The Additional List 2;

250.   The Additional List 3; and

251.   The Additional List 4.

252.   The property was personal property.

253.   Defendants wrongfully exercised and continue to wrongfully exercise dominion or control over the property.

254.   Plaintiff suffered and continues to suffer injury.

255.   Defendants' unlawful conduct was wanton, willful, and malicious warranting the imposition of exemplary damages in an amount to be determined by the trier of fact.

256.   Defendants' unlawful conduct has caused and will continue to cause Plaintiff irreparable injuries for which there is no adequate legal remedy. Accordingly, Plaintiff is entitled to permanent injunctive relief.

## <u>Count Six: Unjust Enrichment</u>

257.   Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as if set forth in full herein.

258.   Defendants received the benefit of Plaintiff's expenditure of time, effort, and resources, including the Certain Approval Lists, without paying for them.

259.   Defendants used deception and subterfuge to hide the fact that Defendants were not paying Plaintiff all money to which it was entitled.

260.   It would be unjust to allow Defendants to retain the benefit of Plaintiff's time, effort, and resources without disgorging the value of the benefit conferred and compensating Plaintiff.

261.   Plaintiff is entitled to disgorge the value of the benefit, including moneys gained and moneys saved, due to Defendants' actions.

## Count Seven: Vicarious Liability

262.   Plaintiff realleges and incorporates the allegations set forth in the preceding paragraphs as if set forth in full herein.

263.   Defendants Bryan Ellis, Carole Jeanne VanSickle, and WebWords in combination agreed to defraud Plaintiff.

264.   Defendants knew that the agreed acts would result in harm to Plaintiff.

265.   To accomplish the object of their agreement, Defendants committed one or more overt acts.

266.   Defendants' unlawful acts caused Plaintiff damage in an amount to be determined by the trier of fact.

267.   Defendants' unlawful acts unjustly enriched Defendants in an amount to be determined by the trier of fact, to which Plaintiff is entitled.

268.   Defendants' unlawful conduct was wanton, willful, and malicious warranting the imposition of exemplary damages in an amount to be determined by the trier of fact.

269.   Defendants' unlawful conduct has caused and will continue to cause Plaintiff irreparable injuries for which there is no adequate legal remedy. Accordingly, Plaintiff is entitled to permanent injunctive relief.

## VI.

## APPLICATION FOR PERMANENT INJUNCTION

270.   Plaintiff realleges and incorporates by reference all preceding paragraphs as fully set forth herein.

271.   Certain Approval further asks the Court to set its application for injunctive relief for a full trial on the issue in this application, and after trial, to issue a permanent injunction against Defendants from further use or disclosure of the EasyHud List, the Virtual Investors List, and the Additional Lists.

## VII.

## **JURY DEMAND**

272.   Plaintiff hereby requests a jury trial on all matters so triable under the Constitution, laws, or statutes of the United States and the State of Georgia.

## VIII.

## **RELIEF REQUESTED**

WHEREFORE, Certain Approval demands that judgment be entered against Defendants as follows:

(1)   That pursuant to federal and Georgia state law, the Court issue permanent injunctive relief that Defendants, their officers, agents, representatives, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with Defendants, be permanently enjoined and restrained, from further use or disclosure of the EasyHud List, the Virtual Investors List, and the Additional Lists;

(2)   That Certain Approval recover all damages it has sustained in an amount to be determined at trial;

(3)   That Certain Approval recover all monies that have unjustly enriched Defendants in an amount to be determined at trial;

(4)    That, in the event that neither damages nor unjust enrichment caused by Defendants' misappropriation of Plaintiff's trade secrets is readily ascertainable, Plaintiff recover damages measured in terms of a reasonable royalty;

(5)    That, in the event the Court determines that it would be unreasonable to prohibit Defendants from the future use of Plaintiff's trade secrets, Plaintiff recover a reasonable royalty;

(6)    That Certain Approval be awarded disgorgement of all economic benefits accruing to Defendants—including any moneys or property gained by one or more Defendants as a result of their individual or collective wrongful actions— in an amount to be determined at trial;

(7)    That Certain Approval recover compensatory damages in an amount to be determined at trial;

(8)    That Certain Approval be awarded exemplary damages in an amount to be determined at trial;

(9)    That the Court rescind the Joint Venture Agreement;

(10)    That Defendants be required to pay Certain Approval's costs, expenses, and reasonable attorney's fees in connection with this action;

(11)   That imposes a constructive trust on Defendants for Plaintiff's benefit over all monies Defendants made and continue to make from the use of Plaintiff's trade secrets;

(12)   That disgorges all monies Defendants made and continue to make from the use of Plaintiff's trade secrets;

(13)   That imposes a constructive trust on Defendants for Plaintiff's benefit over 50% of all monies earned, received, or made by the Joint Venture;

(14)   That disgorges from Defendants 50% of all monies earned, received, or made by the Joint Venture;

(15)   That imposes a constructive trust on Defendants for Plaintiff's benefit over of all monies earned, received, or made by Defendants using the Certain Approval Lists;

(16)   That Defendants be required to provide a full and complete accounting of all monies earned, received, made, or spent by the Joint Venture;

(17)   That Defendants be required to provide a full and complete accounting of all monies earned, received, or made by Defendants using the Certain Approval Lists; and

(18)   That Certain Approval be entitled to such other relief as this Court deems just and equitable.

54

Dated: June 19, 2012

Respectfully submitted,

BY:   WEBB, KLASE & LEMOND, L.L.C.

/s/E. Adam Webb
E. Adam Webb
   Georgia State Bar No. 743910
Matthew C. Klase
   Georgia State Bar No. 141903
G. Franklin Lemond, Jr.
   Georgia State Bar No. 141315
John L. Lyon
   Georgia State Bar No. 833001

1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
(770) 444-0271 (fax)


Kenton J. Hutcherson*
   Texas State Bar No. 24050798
**HUTCHERSON LAW**
10000 North Central Expressway
Suite 800
Dallas, Texas 75231
Tel: (214) 443-4200
Fax: (214) 443-4210

**ATTORNEYS FOR PLAINTIFF**

*Application for *Pro Hac Vice* Forthcoming

55